IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:09CV374 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| $93,120.00 in United States Currency, | ) | RECOMMENDATION |
| | ) | |
| Defendant, | ) | and |
| | ) | |
| MICHAEL J. FOX, | ) | ORDER |
| | ) | |
| Claimant. | ) | |

This matter is before the court on the motion to suppress filed by claimant Michael J. Fox (Fox) (Filing No. 40). This is an action under 28 U.S.C. §§ 1345, 1355 and 1395 and 21 U.S.C. § 881 for the forfeiture of $93,120.00 in U.S. currency to the United States, which was seized from Fox on June 18, 2009, following a traffic stop by the Nebraska State Patrol (NSP) (Filing No. 1). Fox has filed a claim for the return of the $93,120.00 (Filing No. 8). Fox asserts the seizure of the currency was without probable cause and his subsequent interrogation resulted in him making statements after he had invoked his *Miranda* rights and requested counsel (Filing No. 40).

The court held an evidentiary hearing on the motion on July 28, 2010. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. Fox was represented by Eugene Action and Timothy P. Nyberg. The court heard the testimony of NSP Trooper Robert Jason Pelster (Trooper Pelster). The court received into evidence a copy of a permission to search (Exhibit 1), an advice of rights form (Exhibit 2), a disclaimer of interest and ownership (Exhibit 3), a videotape of the traffic stop (Exhibit 4) and a videotape of Fox's interview (Exhibit 5). A transcript (TR.) of the hearing was filed on August 5, 2010 (Filing No. 54).

## FINDINGS OF FACT

Trooper Pelster is a ten-year veteran with the NSP assigned to the NSP traffic division (TR. 16). As such, Trooper Pelster is engaged in enforcing traffic laws, investigating accidents, assisting other law enforcement agencies, responding to emergency calls, and interdicting criminal activity on Interstate 80 (TR. 16-17). Trooper Pelster works out of Headquarters Troop area in Lincoln, Nebraska, and spends the majority of his patrol time on Interstate 80 (TR. 17). Trooper Pelster conducts the patrol in an NSP uniform and in a marked NSP cruiser (TR. 18).

On June 18, 2009, Trooper Pelster was working a 12-hour shift beginning at 5:00 a.m. on a High Intensity Drug Trafficking Area (HIDTA) funded project (TR. 19). Around 7:23 a.m., Trooper Pelster was parked in the median of Interstate 80 at mile marker 366 in Seward County, Nebraska, approximately thirty-six miles west of Lincoln, Nebraska (TR. 20). He was at the bottom of, and between, two hills running radar and facing west with the eastbound traffic approaching the front of his cruiser (TR. 20). Trooper Pelster observed a westbound vehicle, an Explorer, in the driving lane of the Interstate, approaching his position (TR. 21). Trooper Pelster visually estimated the speed of the Explorer to be in excess of the posted speed limit, which was seventy-five miles per hour (TR. 21, 23). Trooper Pelster activated his rear radar antenna and received a speed reading of eighty miles per hour, which matched the Doppler tone of the radar unit (TR. 21, 81). Trooper Pelster had calibrated his radar equipment at the beginning of his shift that morning and the equipment was working properly (TR. 22). Trooper Pelster determined he would make a traffic stop of the Explorer, and as it passed Trooper Pelster's position, he exited the median in order to catch up with the Explorer (TR. 22).

Trooper Pelster caught up to the Explorer approximately two miles west of his initial stationary position (TR. 22). In doing so, Trooper Pelster looked more closely at the Explorer, ran the license plate for wants or warrants, and observed there appeared to be a single male occupant in the Explorer (TR. 22). Trooper Pelster believed the Explorer to be a rental vehicle, which appeared to be brand new with a luggage carrier on top (TR. 23). From Trooper Pelster's experience in coming into contact with vehicles, Trooper Pelster believed the Explorer to be a rental unit because it was a brand new vehicle, it did not have

a license plate bracket, it had no dealership sticker, it had no window tint other than factory tint, it was a solid color and had no mud flaps (TR. 24). The radio check confirmed the Explorer was a 2010 rental vehicle registered to PV Holding, which Trooper Pelster believed, based on his past experience, was a holding company or lien holder for Avis rental vehicles (TR. 26-27). As Trooper Pelster initiated the traffic stop, he drove into the lane behind the Explorer and activated his emergency lights (TR. 24). When Trooper Pelster activated his overhead lights, his in-car camera and microphone turned on (TR. 27; Exhibit 4). The Explorer pulled over without incident (TR. 27).

  Trooper Pelster stopped behind the Explorer, exited the cruiser, approached the Explorer's passenger side, identified himself, and greeted the driver, who was the claimant Fox (TR. 29). Trooper Pelster told Fox the stop was for speeding and requested Fox's license and registration (TR. 28). Fox provided his license and a rental agreement to Trooper Pelster (TR. 28, 30). Trooper Pelster inquired of Fox as to his purpose for travel and his travel itinerary (TR. 29). Fox told Trooper Pelster that Fox owned a solar company and he was coming from a meeting in Cleveland, Ohio, about buying products for his solar business (TR. 29-30). Trooper Pelster noted the driver's license was issued in California and the vehicle rental agreement was from Reno, Nevada, with a rental date of June 3, 2009 (TR. 31). Trooper Pelster noted the Explorer was rented in Reno some three to four hours away from Fox's residence and the rental agreement was for a seven-day period, a period that had expired at the time of the stop on June 18th (TR. 31). Trooper Pelster was suspicious of Fox, due to the travel itinerary including travel from a drug source area to a drug destination area, then returning (TR. 127-128).

  Trooper Pelster asked Fox to come back to the cruiser and have a seat (TR. 32). As Trooper Pelster walked back to the cruiser, he looked inside the Explorer and noted a lot of trash and miscellaneous food items about the vehicle, which indicated to Trooper Pelster that Fox had been traveling a lot without stopping (TR. 32). Trooper Pelster also noted hanging clothes in the rear of the Explorer, which Trooper Pelster believed to be a indicator of feigned business activity (TR. 33). Fox had a small amount of luggage (two coolers and a small bag) inside the vehicle's relatively empty cargo area, raising Trooper Pelster's suspicions because there was a large carrier on top of the Explorer (TR. 34-35).

When both Trooper Pelster and Fox were inside the cruiser, Trooper Pelster engaged Fox in conversation regarding Fox's employment and travel itinerary (TR. 35). Fox stated he visited a friend in Pennsylvania and had done some camping in Tennessee (TR. 35). When asked what was in the carrier on top of the Explorer, Fox explained there was camping gear in the carrier (TR. 36). Trooper Pelster noted Fox was hesitant in his answers and appeared to think a lot about his answers (TR. 36). Trooper Pelster asked Fox about his trip (TR. 37). Fox stated he went to Cleveland to have lunch with some members of First Solar on June 10th, as he wanted to buy some solar panels from them (TR. 37-38). Because Trooper Pelster noticed the Explorer was rented on June 3rd through June 10th, he asked why the Explorer was only rented through the 10th when Fox had a meeting in Cleveland on the 10th (TR. 38). Fox said he rented the Explorer for a week as that was the thing to do (TR. 38). Since it was June 18th, Trooper Pelster asked Fox about the Explorer being overdue and Fox stated he had extended the rental agreement over the phone (TR. 38-39).

Trooper Pelster asked Fox about any previous arrests or contact with law enforcement and Fox stated he had been arrested in California for criminal threats, but had not been in any trouble because he was a "business guy" (TR. 39). When Trooper Pelster ran Fox's name and license for wants or warrants and criminal history, Lincoln dispatch responded that Fox's license was valid, but that he had a criminal history involving three arrests for assault (TR. 40). Lincoln dispatch used the code "10-50," which meant to use caution with the subject (TR. 40).

Trooper Pelster completed the warning for speeding, returned all of Fox's documents, and then asked Fox if he could take some of Fox's time to ask some additional questions (TR. 41, 86-87). Fox had reached for the door handle, but sat back in the seat and told Trooper Pelster that would not be a problem (TR. 41). Trooper Pelster explained his duties of criminal interdiction and asked Fox if there were any drugs, weapons, or large amounts of currency in the vehicle (TR. 42-43). Fox said there were none and Trooper Pelster asked Fox whether Trooper Pelster could search the vehicle (TR. 43). Fox said Trooper Pelster could search (TR. 44). Trooper Pelster prepared a written permission to search form, which Fox signed (TR. 44; Exhibit 1). Trooper Pelster called for another NSP

Trooper, Trooper Ryan Henrichs (Trooper Henrichs), to assist in the search (TR. 44-45). Trooper Pelster began the search of the Explorer and Trooper Henrichs arrived approximately ten minutes later (TR. 46). Fox remained in Trooper Pelster's patrol vehicle and made no attempts to contact Trooper Pelster or revoke his consent to search (TR. 49).

During the search, Trooper Pelster returned to the patrol vehicle and asked Fox if there was a key to the luggage carrier (TR. 49-50). Fox stated the key was on the ignition key ring, but did not indicate any objection to the search of the luggage carrier (TR. 50). The luggage carrier contained a chair, which still had the price tag affixed, two backpacks, and a rolled-up mat (TR. 51-52). Inside a camouflage-covered backpack was a pillow case and a plastic bag, each with multiple rubber-banded bundles of currency inside (TR. 53). The pillow case was tied closed (TR. 131). Each bundle of currency was approximately two inches thick with three rubber bands, one around each end and the middle of each bundle (TR. 131). Each bundle was made up of primarily twenty dollar bills (TR. 132).

Trooper Pelster believed the bundles of currency to be drug proceeds based on his experience and training (TR. 54). Trooper Pelster arrived at his conclusion based on how the currency was bundled, where it was found, and the circumstances of the traffic stop (TR. 55-56). After Trooper Pelster observed the currency, he returned to the patrol car, asked Fox to get out of the patrol vehicle, and, after telling Fox he was not under arrest, but being detained because of the large amounts of currency, placed Fox in handcuffs (TR. 53). Trooper Pelster told Fox the handcuffs (placed on Fox behind his back) were for officer safety and seated Fox back in the front seat of the patrol vehicle (TR. 57). At that time, Fox claimed ownership of the currency found in the luggage carrier (TR. 95, 108).

Trooper Pelster called for NSP Sergeant Sean Caradori (Sergeant Caradori) to come to the traffic stop and assist as Sergeant Caradori was assigned to the HIDTA drug task force (TR. 57). Also found in the search of the Explorer was a High Times marijuana magazine and a note pad, which Trooper Pelster believed to be a drug ledger, but which Trooper Pelster did not see until after he seized the currency and handcuffed Fox (TR. 58, 117, 120-121). The note pad was found in the luggage located in the cargo area of the Explorer (TR. 58). The bundles of currency were placed in the back seat of the Explorer for transport (TR. 64).

Trooper Pelster decided to transport Fox to the NSP Lincoln traffic office where he could interview Fox and further process the Explorer (TR. 59). The Explorer was towed to the NSP Lincoln traffic office (TR. 84-66). Trooper Pelster testified he wanted to give Fox an opportunity to explain where the money came from and to cooperate in the case (TR. 59). Trooper Pelster transported Fox, still handcuffed behind his back, to the NSP Lincoln traffic office in the back seat of Trooper Pelster's patrol vehicle (TR. 59). At the scene and during the trip back to Lincoln, Trooper Pelster advised Fox of the possibility of a disclaimer of the currency whereby Fox would not have to come back to Nebraska and whereby Fox could leave with his vehicle. Trooper Pelster explained to Fox that he would be advised of his *Miranda* rights when they arrived at the NSP Lincoln traffic office and would further receive an explanation about the matter of the disclaimer (Exhibit 4). Fox asked Trooper Pelster whether he (Fox) had to go to the NSP office (TR. 98-99). Trooper Pelster told Fox that yes, Fox did have to go to the office (TR. 98-99).

Upon arrival at the NSP Lincoln traffic office some forty minutes later, Pelster placed Fox in an interview room where Fox was handcuffed by his left hand to a cement bucket anchored on the interview room floor (TR. 60). Fox placed the contents of his pockets on the interview table after being told to do so (Exhibit 5). Trooper Pelster then counted out the currency Fox placed on the table which amounted to $323.00 (Exhibit 5).

Trooper Pelster told Fox that Fox would have to pay for towing his vehicle from the place of the traffic stop to the NSP Lincoln traffic office and the tow truck driver was waiting outside (Exhibit 5). Trooper Pelster counted out $160.00 from the currency on the table, took the $160.00, and provided it to the tow truck driver waiting outside (Exhibit 5 - 08:29:38). Trooper Pelster returned to the interview room and gave Fox a receipt for the towing fee and then left to get Fox a cup of water (Exhibit 5 - 08:33:24). Trooper Pelster returned with a cup of water and then left again (Exhibit 5 - 08:36:10).

Trooper Pelster returned and advised Fox he was not under arrest but he was being detained to "figure out what the money is all about" (Exhibit 5 - 08:37:39). First, Trooper Pelster filled out a voluntary disclaimer form for the money seized and read the form to Fox (Exhibit 5 - 08:42). Trooper Pelster told Fox the disclaimer was what they discussed at roadside and was a way for Fox to "wipe his hands of this" and be on his way (Exhibit 5).

6

When asked if he understood, Fox stated he understood and then asked if he would he be arrested if he wanted to prove the money was his (Exhibit 5). Trooper Pelster stated no, but the investigation would proceed and he did not know whether Fox would be arrested later (Exhibit 5). Trooper Pelster then pushed the disclaimer to the side, to let Fox think about it (Exhibit 5 - 08:44:01). At that time, Trooper Pelster used a standard NSP Advice of Rights form to advise Fox of his *Miranda* rights and wrote the word "Yes" after reading each of the rights to Fox and receiving Fox's responses (Exhibit 2; Exhibit 5 - 08:45). Fox signed the rights advisory form (Exhibit 5 - 08:45:30). When Trooper Pelster asked Fox if Fox wanted to "talk to [him] about things," Fox stated he wanted to consult with an attorney (Exhibit 5 - 08:45:53). Trooper Pelster told Fox they were "done here," but continued to talk to Fox about what may happen with an investigation into the currency, including the potential interest from the DEA or IRS (Exhibit 5 - 08:46).

  Trooper Pelster then returned to the issue of the disclaimer (Exhibit 5 - 08:47). Fox, who was still handcuffed with one hand to a cement block, continued to ask what the repercussions of his refusal to sign the disclaimer would be (Exhibit 5 - 08:47:45). Trooper Pelster explained that if Fox signed the disclaimer, he could walk out to his vehicle and leave (Exhibit 5 - 08:47). Fox expressed concern that if did not sign he would "rot in jail" and continue to sit there that day and until he could resolve the matter (Exhibit 5 - 08:48). Trooper Pelster asked Fox if he understood the disclaimer. Fox also asked whether he would have to return to Nebraska for a hearing on the ownership of the currency at a later time (Exhibit 5 - 08:49). Trooper Pelster said, "absolutely" and stated that Fox would have to prove the money was from a legitimate source (Exhibit 5 - 08:49). Finally, Trooper Pelster said, "There is the pen, if you want to disclaim it, I'll do what I need to do out here and put you back in the vehicle with your keys" (Exhibit 5 - 08:50). Fox asked, "I will be able to leave, if I disclaim this?" (Exhibit 5 - 08:50:35). Trooper Pelster said, "yes" (Exhibit 5 - 08:50). Fox then re-read the disclaimer and asked again about not signing and whether he would have to come back and bring receipts and prove it was all legitimate, which is why, he said, he needed to talk to an attorney (Exhibit 5 - 08:52-08:54). Fox signed the disclaimer, stating he was concerned that signing was an admission of guilt (Exhibit 3; Exhibit 5 - 08:55).

Trooper Pelster said he would need approximately thirty minutes more to complete some paperwork and get the vehicle ready to go (Exhibit 5 - 08:56). Another officer entered the room and asked Fox what city the currency came from (Exhibit 5 - 08:58). Fox started to answer, then stated he really wanted to talk to an attorney (Exhibit 5 - 08:58). The officer left. Fox waited more than forty minutes, handcuffed in the interview room, even though he had told two officers he needed to use the restroom (Exhibit 5).

While Fox was waiting, Sergeant Caradori and K-9 handler Gordon Downing conducted a discretionary sniff of the subject currency in an office at the NSP Lincoln traffic office (TR. 73-75). After the discretionary sniff and Fox's interview, Trooper Pelster participated in photographing and bagging the currency for transport to the bank (TR. 75-79). Ultimately, Trooper Pelster released Fox to leave at approximately 11:30 a.m. (TR. 79-80).

## CONCLUSIONS OF LAW

### A. The Traffic Stop

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. *Long*, 532 F.3d at 795; *United States v. Chatman*, 119 F.3d 1335, 1340 (8th Cir. 1997) ("[T]he stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot.") (internal quotation omitted).

Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *Untied States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (**quoting** *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about

the driver, purpose of the trip and whether the police officer may search the vehicle. *Peralez*, 526 F.3d at 1119; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008); *United States v. Williams*, 431 F.3d 296, 298 (8th Cir. 2005); *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir. 1999).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *$404,905.00*,182 F.3d at 647. In any event, the scope and length of any investigation must be reasonable. *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (en banc)).

In this case Trooper Pelster, using his appropriately calibrated radar equipment, determined Fox's Explorer was exceeding the posted speed limit on Interstate 80. Trooper Pelster had probable cause to execute the traffic stop. Further, Trooper Pelster was justified in questioning Fox with regard to Fox's itinerary and running Fox's personal data and vehicle data through various computer databases. During this interval of the stop, Fox was properly detained by Trooper Pelster.

### B. The Search of the Explorer

No search warrant is necessary under the Fourth Amendment when a person consents to a search.  However, a consent to search must be voluntary.  The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996).  Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See** *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors).  A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred.  *Id.* (**citing** *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).  "The scope of a consensual search is measured by what the typical reasonable person would have understood by the exchange between the officer and the suspect." *United States v. Lopez-Mendoza*, 601 F.3d 861, 867 (8th Cir. 2010).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.  This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted).  "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008).  The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).

In this case Fox gave Trooper Pelster consent to search the Explorer and its contents.  Fox signed a Permission For Search form giving such consent.  There is no

evidence to suggest the consent was other than voluntary. In fact, the form was signed after a full discussion with Trooper Pelster. Fox did not restrict the search to the inside of the vehicle, nor did he withdraw consent when asked for means to access the luggage carrier. The search did not include destruction of any part of the vehicle or the luggage carrier. A typical reasonable person would have understood the exchange between Trooper Pelster and Fox to include permission to search the vehicle's interior and the luggage carrier. Fox did not withdraw his consent or otherwise restrict the consent prior to law enforcement finding the currency in the overhead luggage carrier. Accordingly, the warrantless search of the Explorer and overhead luggage carrier were proper under the Fourth Amendment.

### C. The Detention and Seizure

While the discovery of the currency was without constitutional infirmity, Fox also questions the subsequent detention and seizure of the currency. Fox asserts probable cause was necessary for the currency's seizure. Fox argues an illegal seizure of the currency should result in suppression of any evidence subsequently located and the results of the discretionary dog sniff of the currency. The government contends the evidence supports an investigatory detention of the currency based on reasonable suspicion of criminal activity. Similarly, the government argues Fox was involuntarily detained at the same time officers seized the currency based on reasonable suspicion of criminal activity.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. The Fourth Amendment protects an individual's privacy interests in the contents of personal luggage. *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 1999). However, not every interference with an individual's luggage constitutes a search or a seizure within the meaning of the Fourth Amendment. *Gwinn*, 191 F.3d at 878. A seizure occurs only when law enforcement "meaningfully interfere[s]" with an individual's possessory interests in the property. *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (en banc) (addressing lugged checked with a common carrier) (**quoting** *United States v. Jacobsen*,

466 U.S. 109, 113 (1984)). The court must determine whether law enforcement's detention of the luggage delayed a passenger's travel or significantly impacted the passenger's freedom of movement. *Va Lerie*, 424 F.3d at 707. If the detention caused such delay, the government must show there was sufficient information at the time of the seizure for a reasonable officer to suspect the luggage contained contraband or evidence of illegal activity. **See** *id.* Incidentally,

> '[W]hen the police seize luggage from [a] suspect's custody, . . . the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.' Therefore, the seizure of a traveler's luggage for investigatory purposes must be supported by a reasonable belief, based on specific and articulable facts, that it contains contraband.

*United States v. Allison*, 637 F. Supp. 2d 657, 668 (S.D. Iowa 2009) (**quoting** *Place*, 462 U.S. at 703); **see** *United States v. Zacher*, 465 F.3d 336, 338 (8th Cir. 2006) (addressing seizure of mailed package containing currency).

Here, the officer's search of the vehicle and observation of the currency was based on Fox's consent. However, seizing the currency for transport to the NSP Lincoln traffic office caused significant delay and impact on Fox's travel and freedom of movement. Accordingly, the officer meaningfully interfered with Fox's possessory interest in the currency. Therefore, legal justification must support the currency's seizure. The court finds the officer lacked sufficient information at the time of the seizure to provide justification. The court need not decide whether probable cause or reasonable suspicion was required because the government fails to provide justification under the lesser standard of reasonable suspicion.

The court examines the totality of the circumstances to determines the reasonableness of the officer's conduct. *United States v. Suitt*, 569 F.3d 867, 871 (8th Cir. 2009). "Possession of a large sum of cash is 'strong evidence' of a connection to drug activity." *United States v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) (**quoting** *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501-02 (8th Cir. 2004)). Similarly, "bundling and concealment of large amounts of currency, combined with

other suspicious circumstances, supports a connection between money and drug trafficking." *$124,700 in U.S. Currency*, 458 F.3d at 826 (seven bundles of currency found in a cooler in a large plastic bag wrapped in rubber bands inside aluminum foil packaging); *United States v. $117,920.00 in U.S. Currency*, 413 F.3d 826, 829 (8th Cir. 2005) (currency bundled in rubber bands, enclosed within a plastic sack, and hidden beneath clothing in a duffle bag, combined with contents of trunk, which included plastic bags, plastic wrap, cans of air freshener, and digital scale). Other circumstances may also support a finding of reasonable suspicion such as (1) whether the suspect lied to officers (*$117,920.00 in U.S. Currency*, 413 F.3d at 829 (suspect lied to officers about presence of currency and luggage smelled of marijuana); *$84,615 in U.S. Currency*, 379 F.3d at 501-02 (suspect lied about currency)); (2) whether the suspect gave hesitant, evasive, and incomplete answers to officer's questions (*Suitt*, 569 F.3d at 872); and (3) whether the stated travel itinerary reasonably raised suspicions such as the traveler moving between a source city and distribution city (*United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004) (noting, among other factors, fast food trash in vehicle, travel from drug source state, no visible luggage, and unbelievable explanation for travel); *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001) (noting unusual travel itinerary related to drug source and destination states)). The strength of the suspicion is relevant to the length of the investigatory detention. **See** *Suitt*, 569 F.3d at 872.

The officers seized the currency, not merely to briefly prolong the traffic stop to initiate a dog sniff, or to ask Fox additional questions. In fact, Trooper Pelster had already determined he would move the currency and Fox to the NSP Lincoln traffic office prior to asking any additional questions to dispel his suspicions. The officer's suspicions were primarily based on the amount of currency located. Although the officer also testified about his suspicions based on Fox's rental vehicle, travel itinerary, the vehicle's content, and Fox's hesitant answers, demeanor, and statements, the court finds these factors alone do not justify the currency's seizure and removal to the NSP Lincoln traffic office. **See** *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998) (finding no reasonable suspicion when combined factors included rental car, licensed in California with fast food trash, but without visible luggage, and suspect's nervous demeanor and unbelievable explanation for travel

from a drug source state to a drug demand state).  Finally, the dog's later alert cannot retrospectively justify the seizure.  Accordingly, the officer's unreasonable seizure of the subject currency justifies granting Fox's motion with regard to the subsequent discretionary dog sniff.

### D. Statements

Fox seeks to suppress any statements he made while he was in police custody. The government agrees that it will not use evidence of the disclaimer form in its case in chief.  **See** Filing No. 43 - Response p. 11.  Fox seeks to exclude evidence of the disclaimer form also as impeachment evidence.  **See** Filing No. 47 - Reply p. 7.

The government has the burden to prove the encounter between Fox and the officer's was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant after the initial traffic stop.  **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority.").  "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008).

"It is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005) (**quoting** *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).  "Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch.  To satisfy the Fourth Amendment, officers

must be able to articulate some minimal, objective justification for a *Terry* stop." *Griffith*, 533 F.3d at 983-84.

"An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'" *Maltais*, 403 F.3d at 556 (**quoting** *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). Further, the "officers should employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the temporary seizure." *Maltais*, 403 F.3d at 556 (internal quotation and citation omitted). Finally, "[t]he means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers." *Id.*; *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (noting that the use of handcuffs can be a reasonable precaution during a Terry stop).

Transporting Fox to the NSP Lincoln traffic office was unreasonable; the custodial detention amounted to an illegal arrest. **See** *United States v. Dumas*, 897 F.2d 300 (8th Cir.1990).

> In contrast to the brief and narrowly circumscribed intrusions involved in [*Terry* stop] cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

*Dunaway v. New York*, 442 U.S. 200, (1979); *United States v. Nevils*, 897 F.2d 300, 308-09 (8th Cir. 1990) (finding one and one-half hour detention supported by probable cause for arrest and justified after reasonable detention at scene).

In this case, Fox was transported to the NSP Lincoln traffic office, while continuously handcuffed, and then handcuffed to a cement block. He was detained for substantial amount of time for questioning by more than one officer quite a distance from where the officers initiated the investigation. Fox was not told he was free to leave, except in the context of signing a disclaimer for the currency. The court agrees with Fox that this deceptive practice created and "unstated implication being that if Fox did not sign the

disclaimer the detention would continue." **See** Filing No. 41 - Brief p. 13. These tactics are more in line with a custodial situation than a brief investigatory detention. Even if, arguendo, the information the officers had about Fox and the circumstances of his travel may suffice for reasonable suspicion, it does not reach the level of probable cause to believe that an offense had been or was being committed. The court finds the officer seized Fox, amounting to an arrest, when he was placed in handcuffs.

In any event, the touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278, 279 (1936). A court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

Here, Fox was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), both orally and in writing at the NSP Lincoln traffic office. There is no evidence Fox did not understand the advice of rights. In fact, Fox invoked his right to remain silent and consult with counsel. "After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010). However, despite Fox clearly declining to give any statements without consultation with counsel, Trooper Pelster continued to talk to Fox about the bad situation he was in and suggested Fox could be on his way, if Fox signed the disclaimer. Additionally, another officer entered the interrogation room to ask Fox about the currency.

In determining whether a defendant made statements voluntarily, the court must also determine if the accused was coerced or his will was overborne. *United States v. Wilson*, 787 F.2d 375, 380-81 (8th Cir. 1986). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth*, 412 U.S. at 225-26. Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. *Connelly*, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made

16

against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. See *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The court finds coercive law enforcement pressure was employed in this case. The court finds Fox's statements were involuntarily made. Similarly, the court finds Fox involuntarily signed the disclaimer form. Fox's motion to suppress any statements should be granted. The government has failed to show any exception to the exclusionary rule may apply. Therefore, the court will recommend Fox's statements made subsequent to his being handcuffed, including the disclaimer, be suppressed.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

The claimant's motion to suppress (Filing No. 40) be granted with regard to any evidence or statements obtained subsequent to seizure of Fox and the currency. In all other respects, the motion should be denied.

**IT IS ORDERED:**

1.   Any party shall have to **on or before March 8, 2011**, to file an objection to this Findings and Recommendation and Order, pursuant to NECivR 72.2. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

2.   Any party shall have to **on or before March 22, 2011**, to file a response to any objection filed.

DATED this 23rd day of February, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.